UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

United States of America,                              Case No. 3:24-cr-199

            Plaintiff,

     v.                                               MEMORANDUM OPINION
                                                         AND ORDER

Billy Joe Fulks,

            Defendant.

## I.     INTRODUCTION

Defendant Billy Joe Fulks seeks to suppress evidence seized during a search of a house in which he resided, including statements Fulks made to law enforcement officers. (Doc. No. 19). The government filed a brief in opposition to the motion. (Doc. No. 23). For the reasons stated below, I deny Fulks's motion.

## II.     BACKGROUND

On September 24, 2023, FBI Special Agent Kyle Fulmer submitted an affidavit in support of a search warrant application for a motor vehicle and two residential properties in connection with an investigation into suspected drug trafficking. (Doc. No. 23-1) (filed under seal). Fulks resided at one of those properties, located on Albar Drive in Toledo, Ohio, along with his girlfriend, Ebony Gregory.

Investigators began working with a confidential source in October 2022. The source was distributing fentanyl that he or she obtained from an individual identified as Tanell Hudson. (*Id.* at

7-8). The source would contact Hudson via cell phone and he or she periodically met with Hudson in Hudson's white GMC Yukon at various locations around the Toledo, Ohio area. (*Id.* at 8). Between January 2023 and July 2023, the source engaged in numerous controlled purchases of illegal narcotics from Hudson using funds provided by investigators and while wearing a concealed recording device. (*Id.* at 9).

These controlled purchases often followed a similar pattern. For example, the source engaged in a controlled buy on January 19, 2023. The source discussed purchasing fentanyl from Hudson through text messaging and Hudson subsequently called the source. After the source told Hudson the source had $2,000 for the buy, Hudson told the source to meet him in 20 minutes at a Little Caesars on Alexis Road in Toledo, Ohio. (*Id.* at 11-12). As investigators conducted surveillance of Hudson's residence on West Alexis Road, Hudson exited the residence and drove away in the Yukon. Hudson first went to a nail salon near the intersection of Monroe Street and Talmadge Road in Toledo before continuing to Fulks's Albar Drive residence and going inside. (*Id.* at 12).

While inside, Hudson called the source to confirm he or she was at the Little Caesars. (*Id.*). Upon receiving confirmation, Hudson left the Albar Drive residence, drove to Little Caesars, met with the source, and completed the buy. (*Id.* at 12-13). Hudson then drove back to Fulks's Albar Drive residence and again went inside. (*Id.* at 13). He stayed for a brief time before returning to his West Alexis Road residence. (*Id.*).

On at least three additional occasions, Hudson went to Fulks's residence both before and after completing a controlled buy with the source. (*Id.* at 14-15, 16-17, 18-19). Further, Hudson went to the Albar Drive residence either before or after a controlled buy with the source on at least four other occasions. (*Id.* at 19-20, 26, 29, 32-33). In addition to these in-person meetings, Agent

2

Fulmer averred that Hudson and Fulks exchanged "an abundance of calls and communications" during this period. (*Id.* at 10).

Fulmer opined, based on the evidence gathered during the investigation as well as his training and experience, that Hudson would obtain fentanyl from the Albar Drive residence, sell it to the source, and then take the proceeds from the sale back to Fulks. (*See, e.g., id.* at 15). Fulmer noted that both Hudson and Fulks previously had been convicted of several felony drug trafficking offenses. (*Id.* at 34-35).

Magistrate Judge Darrell A. Clay concluded the search warrant affidavit established probable cause and approved the search warrant application for the Albar Drive residence, authorizing officers to search for evidence related to the purchase and sale of illegal narcotics, including the drugs themselves, tools used in cutting and handling narcotics, and proceeds from those sales. (*Id.* at 1-3). The following day – September 15, 2023 – law enforcement officers executed the search warrant and seized narcotics, drug paraphernalia, and several cell phones. (*Id.* at 39-41). Fulks was arrested following the execution of the search warrant and subsequently charged with illegally possessing a firearm and possession with the intent to distribute a controlled substance. (Doc. No. 1).

### III.  ANALYSIS

Fulks contends the search warrant affidavit failed to establish a fair probability that evidence of a crime would be found at his residence and further that the affidavit was so deficient that no reasonable law enforcement officer could rely on it in good faith. (Doc. No. 19). The government disagrees with both bases. (Doc. No. 23). I consider each argument in turn.

#### A.  PROBABLE CAUSE

The Fourth Amendment generally requires law enforcement officers to obtain a warrant, based upon probable cause, before searching a location in which an individual has a reasonable

3

expectation of privacy. *See, e.g., Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) ("When an individual 'seeks to preserve something as private,' and his expectation of privacy is 'one that society is prepared to recognize as reasonable,' we have held that official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause.") (further citation omitted). Probable cause is the "reasonable grounds for belief" that evidence of a crime may be found in a certain place or location. *United Stated v. Lattner*, 385 F.3d 947, 951 (6th Cir. 2004) (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)). "Probable cause exists when there is a 'fair probability,' given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." *United States v. Loggins*, 777 F.2d 336, 338 (6th Cir. 1985) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

The probable cause inquiry does not require "an 'actual showing' of criminal activity at the target location, . . . instead ask[ing] whether officers provided direct or circumstantial support to create 'more than mere suspicion' that contraband will be found at the location in question." *United States v. Sanders*, 106 F.4th 455, 462 (6th Cir. 2024) (en banc) (quoting *United States v. Christian*, 925 F.3d 305, 311 (6th Cir. 2019), and *United States v. King*, 227 F.3d 732, 739 (6th Cir. 2000) (further citation omitted)).

The principles underlying a court's probable cause review are familiar. The Fourth Amendment requires only that "the magistrate had a 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing." *Gates*, 462 U.S. at 236 (citation omitted) (alteration by *Gates*). An affidavit "should be reviewed in a commonsense – rather than a hypertechnical – manner, and the court should consider whether the totality of the circumstances supports a finding of probable cause, rather than engaging in line-by-line scrutiny." *United States v. Woosley*, 361 F.3d 924, 926 (6th Cir. 2004). A magistrate judge's probable-cause determination is entitled to "great

deference." *Sanders*, 106 F.4th at 461 (quoting *Christian*, 925 F.3d at 311-12 (further citation and quotation marks omitted)).

I conclude the search warrant affidavit establishes probable cause that evidence of a crime would be found at the Albar Drive residence. Investigators provided funds to the source to conduct a controlled purchase of fentanyl from Hudson on at least 11 occasions. (*See* Doc. No. 23-1). On the dates of at least 8 of those controlled buys, Hudson went to Fulks's Albar Drive residence, either prior to, after, or both. On several occasions, when Hudson went to the Albar Drive residence before the controlled buy, he left his own residence, drove to Albar Drive, and then drove directly to the location of the controlled buy. (*See id.* at 14-16).

On one particular occasion – May 5, 2023 – the source contacted Hudson to set up a controlled buy. (*Id.* at 17). Hudson told the source he was in the Detroit area but would be returning to Toledo soon to meet the source. Investigators observed Hudson arrive at the Albar Drive residence and wait in his Yukon until Fulks arrived at the property. (*Id.* at 18). When Fulks arrived, Hudson exited his vehicle and entered the house with Fulks. The source subsequently called Hudson to tell him that he or she was in the Little Caesars parking lot. (*Id.*). Hudson then left the Albar Drive residence and drove straight to the parking lot and completed the controlled buy. (*Id.*).

Then, after each of the controlled buys, investigators confirmed the source had given Hudson the provided funds in exchange for a substance containing fentanyl. Hudson repeatedly left the Little Caesar parking lot following the controlled buys and drove the Albar Drive residence. Fulmer was permitted to draw the reasonable inference there was a fair probability that Hudson obtained the fentanyl at the Albar Drive property and then returned there with the proceeds from the sales.

The Sixth Circuit's decision in *Sanders* illustrates the point. The *Sanders* court noted officers may offer both direct and circumstantial evidence to establish probable cause. Direct evidence may

5

include "a credible informant's tip of criminal activity occurring in or directly outside of the location of the search," or evidence which "might indicate that the proceeds of a crime will be found in the place to be searched." *Sanders*, 106 F.4th at 462.

> Other times, circumstantial evidence will do the trick. That is so where, for instance, officers, after observing a person leave a location, soon find the individual possessing contraband, possibly even engaging in a sale involving the contraband, suggesting that the illicit materials came from the location. . . . Other cases involve search warrants describing a controlled purchase of contraband followed by the defendant returning to the location sought to be searched, creating a reasonable inference that the defendant took the proceeds with him. . . .

*Id.* (citations omitted).

> The facts in *Sanders* also bear significant similarities to those in this case:
>
> Take the second buy. Sanders left the apartment, got in his vehicle, and drove directly to the buy location. At that point, the informant entered the car with buy money and left with heroin and fentanyl. Sanders then returned to the apartment, parking his car outside before entering the building. On this record, the informant could have obtained the drugs only from Sanders, who had traveled directly from the apartment to meet the informant. Evidence that one leaves a "residence, engage[s] in a drug transaction, and then return[s] into the residence" "plainly demonstrate[s] a sufficient nexus" with the location.

*Id.* at 463 (quoting *United States v. Ellison*, 632 F.3d 347, 349 (6th Cir. 2011) (alterations by *Sanders*). The *Sanders* court concluded this controlled purchase alone was sufficient to establish probable cause before noting there was additional evidence connecting the property to drug trafficking, including an earlier controlled buy substantially similar to the second buy as well as law enforcement observation of the defendant returning to the apartment immediately after completing the sale. *Sanders*, 106 F.4th at 463.

Here, investigators could connect the Albar Drive residence to at least eight controlled buys. Investigators frequently observed Fulks, his vehicles or both, at the residence when Hudson arrived. (*See, e.g.,* Doc. No. 23-1 at 12, 18, 20). The information in the search warrant affidavit, taken together, constitutes sufficient circumstantial evidence that officers would find narcotics, proceeds

6

from sales of narcotics, or other evidence of drug trafficking at the Albar Drive residence. *Sanders*, 106 F.4th at 466.

Moreover, this lengthy pattern of drug activity provided Magistrate Judge Clay with a substantial basis upon which to conclude there was probable cause to search that property. *See United States v. Rodriguez-Suazo*, 346 F.3d 637, 646-47 (6th Cir. 2003) (discussing affidavit's recitation of information garnered over a period of time and quoting *United States v. Henson,* 848 F.2d 1374, 1382 (6th Cir. 1988), for the principle that "related events covering a broad span of time continuing to the current period may furnish a most reliable indicia of present activity, thereby clearly demonstrating that probable cause exists") (alteration removed).

Fulks resists this conclusion, arguing: "Hudson's presence at Fulks's residence was susceptible to a myriad of [innocent] inferences"; investigators observed only Hudson, and not Fulks, engage in drug transactions; that the inference of drug trafficking drawn from Hudson's visits to the Albar Drive residence is weakened by the fact that Hudson also went to other locations before and after the controlled buys; and that Fulmer impermissibly speculated that Hudson picked up drugs or dropped off money at the Albar Drive residence. (Doc. No. 19 at 7-8). But these arguments are not persuasive.

First, "probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts." *District of Columbia v. Wesby*, 583 U.S. 48, 61 (2018). Instead, a court must "ask[] whether a reasonable officer could conclude—considering all of the surrounding circumstances, including the plausibility of the explanation itself—that there was a 'substantial chance of criminal activity.'" *Id.* (quoting *Gates*, 462 U.S. at 244, n.13). Whatever the initial plausibility of Fulks's "social basis" explanation, (Doc. No. 19 at 7), may have been, that rationalization falls apart in the face of investigators' repeated observations that an individual – here, Hudson – came out of the Albar Drive residence, engaged in a drug transaction, and then returned

7

to the residence. "These incriminating actions are inextricably connected to the residence for which the search warrant was sought." *United States v. Ellison*, 632 F.3d 347, 349 (6th Cir. 2011). Moreover, the probable cause inquiry asks whether there is a connection between a premises and illegal activity; it does not require evidence that the criminal activity was conducted by an individual who lived at the property. *See, e.g., Sanders*, 106 F.4th at 463-64, 466 (discussing connection between an apartment and the defendant's drug trafficking activity and noting "[n]othing in the affidavit suggests [the defendant] lived at the apartment").

Next, Fulks's disagreement with the inferences Fulmer drew also fails to show a lack of probable cause. The search warrant affidavit contains a lengthy recitation of Fulmer's training and experience, including his involvement in hundreds of narcotics investigations over the course of more than 30 years. (Doc. No. 23-1 at 6-7). As the Supreme Court has held, and the government notes, evidence collected during an investigation "'must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.'" *Texas v. Brown*, 460 U.S. 730, 742 (1983) (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)). *See also Ornelas v. United States*, 517 U.S. 690, 699 (1996) ("[A] police officer views the facts through the lens of his police experience and expertise.").

It is true Fulmer repeatedly stated that it "was apparent to [him] from the activity that took place" that Hudson obtained fentanyl from Fulks at the Albar Drive residence to sell to the source and then gave the proceeds of the sale to Fulks at the Albar Drive residence. (*See, e.g.,* Doc. No. 23-1 at 13). But, contrary to Fulks's contention, these statements were not idle speculation. (*See* Doc. No. 19 at 7). Instead, they were inferences Fulmer was permitted to draw based on his investigation, training, and experience in law enforcement, and which Judge Clay was permitted to credit in determining whether probable cause existed for the search. *Brown*, 460 U.S. at 742-43.

8

I conclude Judge Clay had a "substantial basis" to conclude that a search of the Albar Drive residence would uncover evidence of a crime. *Gates*, 462 U.S. at 236 (citation and quotation marks omitted).

### B. GOOD FAITH

Even if I were to assume the warrant violated the Fourth Amendment, I conclude the officers executing it relied upon it in good faith. The Supreme Court has held that the "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal in light of all of the circumstances." *Herring v. United States*, 555 U.S. 135, 145 (2009) (quoting *United States v. Leon*, 468 U.S. 897, 922 n.23 (1984) (internal quotation marks omitted)).

There are "four circumstances in which an officer's reliance on a subsequently invalidated warrant cannot be considered objectively reasonable:

> first, if the issuing magistrate 'was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth;' second, if 'the issuing magistrate wholly abandoned his judicial role;' third, if the affidavit was 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,' or in other words, where 'the warrant application was supported by [nothing] more than a "bare bones" affidavit,' and, fourth, if the 'warrant may be so facially deficient—*i.e.*, failing to particularize the place to be searched or the things to be seized.'"

*United States v. Neal*, 577 F. App'x 434, 448 (6th Cir. 2014) (quoting *United States v. Weaver*, 99 F.3d 1372, 1380 (6th Cir. 1996)).

Fulks claims no reasonably well-trained officer could rely on the search warrant because officers are trained "that the presence of a drug dealer at a residence, without more, does not establish the required nexus between the residence and the probability of finding narcotics at that residence." (Doc. No. 19 at 12). Fulks does not cite to any caselaw in support of this proposition. While his assertion may have some degree of truth behind it, the Sixth Circuit has repeatedly "blessed the inference that 'in the case of drug dealers, evidence is likely to be found where the

9

dealers live.'" *Sanders*, 106 F.4th at 465 (quoting *United States v. Davidson*, 936 F.2d 856, 860 (6th Cir. 1991)) (further citations omitted).

Moreover, this is not a case in which investigators alleged evidence of drug trafficking would be found at the Albar Drive residence simply because Fulks, a thrice-convicted drug trafficker, lived there. Instead, the search warrant affidavit described eight controlled buys "with direct connections" to the Albar Drive residence. *Sanders*, 106 F.4th at 466. Fulks fails to show the search warrant affidavit was "so lacking in indicia of probable cause" that no reasonably well-trained officer could rely on it. *Neal*, 577 F. App'x at 448 (citation and quotation marks omitted).

## IV.  CONCLUSION

I conclude Fulks fails to show there was not probable cause to support the search of the Albar Drive residence or that officers could not have relied on the warrant in good faith. Therefore, and for the reasons set forth above, I deny his motion to suppress. (Doc. No. 19).

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge

10